UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
:
UNITED STATES OF AMERICA, :
: **ORDER DENYING**
-against- : **DEFENDANT'S MOTION TO**
: **SUPPRESS**
DOMINGO BEATO ESTRELLA :
: 20 Cr. 324 (AKH)
Defendant. :
:
--------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Defendant Domingo Beato Estrella moves to suppress evidence of narcotics distribution found by the government in a search of his apartment, and statements he made prior to his arrest. Defendant argues that his consent was coerced in violation of his Fourth and Fifth Amendment rights. On October 5, 2023, I held an evidentiary hearing and heard arguments from counsel on the motion. For the reasons set forth below, I deny Defendant's motion to suppress.

**BACKGROUND**

**I.  The Indictment**

      Defendant was indicted by a grand jury, first of possession with intent to distribute (i) 100 grams or more of mixtures and substances containing a detectable amount of heroin in violation of 21 U.S.C. 841(b)(1)(B), and (ii) mixtures and substances containing a detectable amount of fentanyl in violation of 21 U.S.C. 841(b)(1)(C) and, subsequently, in a superseding indictment filed December 28, 2022 also of bail jumping in violation of 18 U.S.C. 3146(a)(1). ECF No. 21.

## II. Relevant Facts

In January 2020, DEA agents received information from a Confidential Source ("CS") that Defendant was running a heroin mill in an apartment on West 153rd Street in Manhattan. Compl. ¶ 4(a). The CS described Defendant and provided the apartment's location.

On January 30, 2020, around 10:00 a.m., five DEA agents arrived at the apartment to conduct a "knock and talk" with Defendant. Special Agent ("SA") Dibriana Rivas knocked on the door, and Defendant partially opened the door to her. Rivas, in Spanish, told Defendant that she was a member of law enforcement and asked to speak with him. October 5, 2023 Hearing Transcript ("Tr.") 6:9–10. Defendant was undressed and, leaving the door partially opened, asked for a moment to get dressed. Beato Estrella Decl. ¶ 4. Rivas kept her hand on the partially-opened door until Defendant returned. Beato Estrella Decl. ¶ 5. Defendant saw, but did not complain, that his door was being held partially open by Rivas, and returned to speak with her. Beato Estrella Decl. ¶ 5. Meanwhile, Agent Matthew Ryan moved behind her, in Defendant's sight, the others close behind. Tr. 16:22–24. Rivas, stating again that she was law enforcement, asked to come in, and Defendant opened the door for them. Tr. 8:14–25. Rivas, Ryan, and the other three agents quickly entered. One of the agents played his flashlight in the doorway to inspect for anything to be seen. Tr. 35:17–18.

The apartment had a small kitchen and a larger room serving as both a living room and bedroom. Tr. 9:10–11. Rivas, Ryan and Defendant went into the kitchen. Tr. 10:8–10. The three other agents went into the living room. *Id.* Rivas asked Defendant if there were any narcotics or weapons in the Apartment. Tr. 9:3–5. Defendant responded "no," and Rivas asked to search the Apartment. Defendant consented. Tr. 10:5.

Rivas asked Defendant for identification. Defendant provided an identification that gave his name as "Oneill Efrain Cosme-Santiago," but then said that it was fake, used to

2

obtain welfare benefits, and gave his real name, Domingo Beato Estrella. Tr. 55:24–56:2. Meanwhile, the other agents, searching the living space, found narcotics in a shoe box in the closet. Defendant denied that the drugs were his, and claimed that they belonged to a friend, "Gordo," and that Gordo had brought the narcotics to his apartment the day before. Tr. 19:14–16. Defendant denied that there were any other narcotics in the apartment, and the agents found none. But, as represented in the government's brief, the agents found other items: four forms of identification with the name "Oneill Efrain Cosme-Santiago," a key fob for Defendant's friend's vehicle, two cellphones, and indicia of narcotics distribution: wax folds, rubber bands, and scotch tape found in a small closet between the kitchen and the entrance door of the apartment, stamps and ink pads found in the top drawer of the dresser in the living room/bedroom, a grinder and strainer covered in white powder and a plastic bottle of Inositol powder (a suspected drug cutting agent) found in the kitchen pantry closet.

Rivas placed Defendant in handcuffs, arresting him. The agents brought Defendant to their headquarters in Newark. There, for the first time, the agents read Defendant's *Miranda* rights to him, using a written form in Spanish. ECF No. 31-3, Ex. C (Post-Arrest Interview Video), at 12:16-18 p.m. Defendant said that he would not answer questions without a lawyer present, but gave the agents the numbers and passwords for the two cell phones. Rivas gave Defendant consent forms, in Spanish, for searches of his apartment and for his two phones. Defendant signed the consent for the Apartment but not for his cell phones.

Defendant moved to suppress (1) all physical evidence seized from his apartment; (2) statements made to law enforcement agents while inside the apartment; and (3) any post-arrest statements made to law enforcement agents after invoking his right to counsel. The government has agreed not to introduce any statements made by Defendant in his apartment after

he was handcuffed, nor after his invocation of counsel. The issues to be decided relate to the physical evidence found in his apartment and his statements to the Agents before he was handcuffed.

## DISCUSSION

### I. Physical Evidence

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. One exception is if the search is conducted upon the voluntary consent of a person authorized to provide consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). To be valid, the consent to search must be voluntary, or obtained without coercion. *See id.* at 241–42. The government has the burden to prove voluntary consent, considering "the totality of the circumstances." *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993).

There is an "implied license" that allows any private citizen to approach a home, knock on the door, and talk to the occupants. *Florida v. Jardines*, 569 U.S. 1, 8–9 (2013). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8. If the initial entry is legal, no further analysis is required, and a finding of voluntary consent may follow sufficient to justify a search. *United States v. Snype*, 441 F.3d 119, 133 (2d Cir. 2006).

**Defendant's Argument**

Defendant argues that he did not consent to the search of his apartment.

*First*, Defendant argues that Rivas violated the Fourth Amendment by crossing the threshold of the doorway with her head when he opened the door, and then by keeping the door ajar with her hand when he went to get dressed. *See* Beato Estrella Decl. ¶¶ 5-6; *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) ("No invasion of the sanctity of the home can be dismissed as de minimis.").

*Second*, Defendant argues that the agents failed to remove the taint from that initial violation. The Court weighs four factors in assessing whether consent to search is tainted: "(1) the giving of *Miranda* warnings, (2) the temporal proximity of the illegal entry and the alleged consent; (3) the presence of intervening circumstance; and (4) the purpose and flagrancy of the official misconduct." *Snype*, 441 F.3d at 134. Defendant argues that the agents did not give Defendant *Miranda* warnings inside the apartment, the entry and consent happened in close temporal proximity, and there were no intervening circumstances.

*Third*, Defendant asserts in his Declaration that he did not believe he had any choice but to consent. Beato Estrella Decl. ¶¶ 10–11. He states that his apartment was small; that the agents filled it; that he submitted because of their show of force, and that his consent to search was "resignation rather than consent." *United States v. Alberti*, 120 F. Supp. 171, 175 (S.D.N.Y. 1951) (consent not voluntary where, "defendant, who was under arrest, whose apartment was occupied by five agents, some of them obviously armed, who had two children asleep in another bedroom, was informed that the agents intended to search. Under such circumstances, I find that his acquiescence was in the nature of resignation rather than consent.").

**Analysis**

As I held at the hearing on September 13, 2023, and as shown at the evidentiary hearing, Defendant consented to Agents' entry into his apartment.

Defendant did not shut his door while Rivas waited for him to get dressed. When he returned to the door, he knew that additional agents probably were in the hallway as well. Defendant showed willingness to speak and invited the agents to come into his apartment. When they asked to search his apartment after he denied having narcotics, he readily consented.

Defendant's consent was proved through the agents' testimony, which I find to be entirely credible. The minor discrepancies between the agents are not contradictory. *See Manson v. Brathwaite*, 432 U.S. 98 (1977) (discrepancies between eyewitnesses can be "measure[d] intelligently"); *United States v. Anglin*, 169 F.2d 145, 159–60 (2d Cir. 1999) (affirming conviction based on jury's evaluation of witness discrepancies). All three support the assertion that consent was given prior to the search. *See, e.g.*, Tr. 81:16–20. Defendant declined to testify, as his right. Although his Declaration contained conclusory denials, there were no alternative versions of the facts for me to consider.

Defendant argues that his consent was involuntary. Based on the testimony and supplemental letters from the parties, I find consent was voluntary. The agents conducted a knock and talk at 10 in the morning, did not draw their weapons, did not threaten force nor arrest, and did not make physical contact with Defendant prior to obtaining consent. Rivas, who is fluent in Defendant's native tongue of Spanish, did all the communicating with Defendant and translated to the other agents in real-time. All three agents testified that Defendant remained calm and cooperative throughout the incident. Tr. 9:17, 53:12, 71:11.

6

In *United States v. Peña Ontiveros*, multiple agents conducted a knock and talk in the middle of the night and entered the defendant's home when he gave consent. 547 F. Supp. 2d 323, 333–34 (S.D.N.Y. 2008), *aff'd sub. nom, United States v. Rico Beltran*, 409 F. App'x 411 (2d Cir. 2011). The court held that consent was voluntary because, as in this case, the defendant was calm throughout the encounter, was not physically restrained nor interrogated prior to consent, and the agents never drew weapons nor threatened the use of force. Similar circumstances, even with more intimidating aspects, have consistently led to findings of voluntary consent. *See United States v. Gray*, 283 F. App'x 871, 873–74 (2d Cir. 2008) (finding no coercion as a matter of law based on officer testimony that defendant consented, that no weapons were drawn, and that the tone of the encounter was calm and cooperative); *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (consent to search voluntary where defendant was arrested by six officers who had previously pulled their guns and placed the defendant in handcuffs); *United States v. Sanchez*, 635 F.2d 47, 60 (2d Cir. 1980) ("It is true that several officers were present, but there is no indication that the circumstances were inherently coercive. Both [individuals] were calm and relaxed").

Defendant attempts to distinguish *Peña Ontiveros* because some of those officers were clearly identifiable as officers, providing "notice of their role, making the situation less coercive than the situation here." *See* ECF No. 46 at 7. Yet nothing from the record indicates that Defendant did not know the officers were members of law enforcement. Defendant's own affidavit states he did not know there were "other law enforcement agents" in the hallway, and that when he came back to the door "several other law enforcement agents" emerged. Beato Estrella Decl. ¶¶ 5–6. Rivas testified that right after Defendant opened the door, she introduced herself and identified herself as a law enforcement officer. Tr. 6:9–10. She again identified

7

herself as law enforcement when she and the other agents entered. Tr. 8:11. The record also indicates that the officers were objectively identifiable as law enforcement. SA Rivas was wearing her badge and her "police" vest, and at least some of the other officers were wearing badges. Tr. 5:18–19, 68:12–17.

Defendant's voluntary consent fails to create a Fourth Amendment violation. I therefore deny his motion to suppress the physical evidence collected based on this search.

## II. Statements Made Prior to Arrest

Defendant wishes to suppress statements that the government would seek to use against him at trial on the grounds that they were the result of a custodial interrogation. Among these statements is Defendant's admission that the identification he provided was fraudulent and that the narcotics the officers found belonged to someone named Gordo who had sent them to his apartment the day before via taxi. ECF No. 37 at 6, 7. Defendant argues he was in custody when he answered the agents' questions in his apartment, such as those regarding who owned the narcotics the agents found in his apartment.

To protect the Fifth Amendment right against self-incrimination, *Miranda* requires law enforcement agents to warn suspects about their rights prior to questioning. *See United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). Absent those warnings, the government may not use a suspect's statements in its case in chief. *Miranda*'s protections apply, however, only if the suspect is 'in custody.'" *See Newton*, 369 F.3d at 668. The Second Circuit requires an objective test to determine whether a subject was "in custody" when he made statements: (i) whether a reasonable person in the defendant's position would have thought he was "free to leave" and (ii) there was a restraint of freedom of movement akin to a formal arrest. *See Id.* Because "custody" is an objective inquiry, "an individual's subjective belief about his or

8

her status generally does not bear on the custody analysis." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016).

**Defendant's Argument**

Defendant contends he is entitled to suppression of statements the government wishes to use because they were obtained in violation of his *Miranda* rights. Defendant argues that a reasonable person in his shoes would not have felt free to leave, and that the presence of five agents made him feel he was not free to leave. *See* Beato Estrella Decl. ¶¶ 8, 10. He asserts that five law enforcement officers crammed into his small apartment, and their searching of his apartment before he consented led to this belief.

**Analysis**

I find that the facts do not satisfy either of the *Miranda* inquiry's two steps. The facts show, and I find, that Defendant was not in custody when he gave the statements the government desires to use.

First, under an objective standard, Defendant was free to leave. As *United States v. Newton* holds, the presence of multiple officers "would not, by itself, have led a reasonable person in [defendant's] shoes to conclude that he was in custody." *Newton*, 369 F.3d at 675. The defendant in *Newton* filed a motion to suppress after six agents came to his home, he answered the door while in his underwear, and handcuffed him while searching his home. In finding the defendant was in custody for *Miranda* purposes, the Second Circuit was careful to isolate each of these facts: "the handcuffs are the problematic factor," not the number of officers, the search taking place at his home, nor that he was in his underwear. *Id.* at 675–76.

9

Additionally, Defendant was not arrested until after he gave consent and narcotics were found, he permitted law enforcement agents to enter, and he was described as calm and cooperative by all the agents. Defendant's Declaration that he did not feel he could leave is conclusory, and inconsistent with the facts presented at the evidentiary hearing. Clearly, it does not satisfy an objective standard. *Faux*, 828 F.3d at 135 ("An individual's subjective belief about his or her status generally does not bear on the custody analysis").

Second, Defendant's freedom was not constrained. Courts in the Second Circuit "rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'" *Id.* at 135–36. There was no formal arrest here, nor other evidence that Defendant was physically constrained or threatened with the prospect of being constrained.

Therefore, when the agent asked whether the drugs were his and related questions, he was not in custody. The government is free to use his answer and other statements from this period. I find no Fifth Amendment violation based on the circumstances and Second Circuit precedents.

## CONCLUSION

Accordingly, Defendant's motion to suppress is denied. The next conference will take place on November 1, 2023 at 10:00 a.m. in Courtroom 14D. Time is excluded until then, in the interest of justice. *See* 18 U.S.C. § 3161(h)(7)(A). The Clerk is instructed to terminate the motion at ECF No. 29.

SO ORDERED.

Dated: October 16, 2023
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge